**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DON COOK, individually and as parent  PLAINTIFFS
and next friend of D; and ELIZABETH JACOBY,
individually and as parent and next friend of D

v.  No. 4:17CV00218 JLH

LITTLE ROCK SCHOOL DISTRICT  DEFENDANT

**OPINION AND ORDER**

Don Cook and Elizabeth Jacoby, individually and as the parents of their child, referred to herein as "D," filed a due process complaint against Little Rock School District, asserting a claim under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, as well as a claim under section 504 of the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq*. They alleged that the school district denied D a free appropriate public education during the 2015-16 school year when he was an eighth-grade student at Horace Mann Middle School. The heart of their claim was (and is) that the school district failed to develop a behavior intervention plan as a part of D's individualized education program for the 2015-16 school year and, as a result, his behavior deteriorated, which prevented him from progressing academically. Pursuant to 20 U.S.C. § 1415, the Arkansas Department of Education appointed Garry Corrothers to serve as the hearing officer. A hearing took place on May 16, 17, and 18, 2016, and was later concluded on September 9, 2016. The hearing officer held that he lacked jurisdiction over the Rehabilitation Act claims and found that the parents presented insufficient evidence that the school district denied D a free appropriate public education. AR 126. The plaintiffs then commenced this action, seeking reversal of the decision in favor of the school district on their claim under the Individuals with Disabilities Education Act. They also seek costs and attorney's fees. The parties have submitted the case on a stipulated record.

## I.

The Individuals with Disabilities Education Act requires all local educational agencies receiving federal funds to implement policies "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a). A party challenging whether a free appropriate public education has been provided has the right to file an administrative complaint and receive an impartial due process hearing before a local or state agency. *Id.* § 1415(b)(6). An aggrieved party who has no further administrative appeal has the right to seek review of the decision made in a due-process hearing in federal district court without regard to the amount in controversy. *Id.* § 1415(i)(2)(A) and (3)(A).

In actions brought under the Individuals with Disabilities Education Act, a district court serves a quasi-appellate function while remaining a court of original jurisdiction. *See Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court. Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings."). The Eighth Circuit has explained that a district court's role in reviewing a claim brought under the Individuals with Disabilities Education Act is to receive the records of the administrative proceedings, to hear additional evidence at the request of a party, and to grant such relief as the court determines is appropriate based on the preponderance of the evidence. *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011); *see also* 20 U.S.C. § 1415(i)(2)(C). District courts must independently determine whether the school district provided D with a free appropriate public

education, giving "due weight" to the state administrative proceedings. *K.E. ex rel. K.E.*, 647 F.3d at 803. "This somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *Id.* It is nevertheless appropriate "because the administrative panel had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review." *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000).

## II.

D has an autism spectrum disorder. "Autism is a neurodevelopmental disorder marked by impaired social and communicative skills, 'engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.'" *Endrew F. Ex rel. Joseph F. V. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 996, 197 L. Ed. 2d 335 (2017) (citation omitted). D started sixth grade at Pulaski Heights Middle School, but in February 2014 he transferred to Horace Mann because of a combination of severe behavioral regression and issues with the manner staff at Pulaski Heights addressed D's behavior. AR 1344; AR 1175-1212. D continued to attend Horace Mann through seventh and eighth grades, which were the 2014-15 and 2015-16 school years. AR 1342.

Shortly after D transferred to Horace Mann, Dr. Peggy Whitby, at the request of D's parents and lawyers, issued a report on whether D was being provided with a free appropriate public education. AR 1174-1213. The report lists numerous deficiencies in the manner in which Pulaski Heights addressed D's needs. It documents in detail various instances throughout the first semester of the 2013-14 school year in which D's education plan was not followed, D was removed forcibly

3

from classrooms, and staff at the school used ineffective behavioral interventions. AR 1194-1212. In Whitby's section on recommendations, she begins by noting that "[D] is now served at Horace Mann Arts Middle School" and "in this environment, it appears that the school is now using proactive strategies to prevent behaviors." AR 1212. She also states that "[t]he paraprofessional was using appropriate use of breaks, choice, and positive reinforcement for on-task behavior" and that "[D] has had no incidents of aggressive behavior since his placement at this new school environment." *Id*. Although Whitby believed D was doing "very well" at Horace Mann, she recommended that D undergo a functional behavior assessment and that D's education team develop and implement a behavior intervention plan. AR 1212-13.

The Act requires that local educational agencies "have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program." 20 U.S.C. § 1414(d)(2)(A). An individualized education program is developed by a team composed of the child's parents, at least one of the child's regular education teachers, at least one of the child's special education teachers, a qualified representative of the local educational agency, and an individual capable of interpreting the instructional implications of evaluation results. *Id.* § 1414(d)(1)(B). Once a program is developed and adopted, it may only be modified "by the entire IEP Team" or by agreement of the parents and local educational agency to "develop a written document to amend or modify the child's current IEP." *Id.* § 1414(d)(3).

After D's parents received Whitby's report, D's education team met at the end of the 2013-14 school year to develop an individualized education program for D. AR 1134. D's individualized education program included 60 minutes per week of speech therapy, occupational therapy, and physical therapy and provided him with a paraprofessional on a daily basis. AR 1133. The program

4

also included the following behavior management strategies: a calming area in D's general education and special education settings ("SAFE HAVEN"); use of a "visual/written schedule"; preparing D in advance of changes in his routine; and use of a word processor. AR 1140. These strategies mirror recommendations in a report issued by Sandy Crawley, a behavior support specialist, who observed D and provided the school district with a program of "positive behavior supports" on April 23, 2014. AR 1240-41. The individualized education program noted that D's behavior did not significantly impair his ability to learn in a large group setting. AR 1138.

The team met again in May 2015 to develop D's individual education program for the 2015-16 school year. D's parents attended, and the "Statement of Parental Participation and Concerns" states that D's parents "are very pleased with [D's] progress academically and socially." AR 1118. D's "Student Profile Summary" notes that D scored below basic in literacy and math and scored basic in science. *Id.* The team, however, did not think those scores were "a true register of his academic ability." *Id.* The team found that D "continued to make progress in the general curriculum as evidenced by achieving passing grades in all academic areas by the 3rd quarter." AR 1124. D's education program continued to provide him with a paraprofessional to support him throughout the day. *Id.* D also continued with 60 minutes per week of speech therapy, occupational therapy, and physical therapy. AR 1116.

D's individualized education plan for the 2015-16 school year noted that he had a behavior support plan. AR 1119. His paraprofessional worked with him on classroom procedures, such as raising his hand and waiting to be called on and obtaining permission to leave class. AR 1118. The annual review, in which D's parents participated and which is included in D's 2015-16 education program, states that "since [D's] arrival here at Mann, his behaviors, while still present, continue

5

to be much more manageable . . . with the support of his paraprofessional." AR 1124. The review adds that D's inappropriate behavior has been effectively managed "with a flexible routine and schedule." *Id.* The team created an annual goal for D to "display productive school behavior on a daily basis with 80% accuracy." AR 1127. This goal was to be measured by D's attendance and preparation for class. *Id.* D's 2015-16 individualized education program, like the program for the prior year, provided the following behavior management strategies: a calming area, use of a visual/written schedule; preparing D in advance of changes in his routine; use of a word processor; and added use of a calculator. AR 1129. Finally, the team noted that D did not need "an intensive behavior management program." AR 1131.

On October 14, 2015, D's team met to review his progress for the first nine weeks of the school year. Although D had an F in English for that nine weeks, the conference notes stated that D would continue in his current placement and that he had shown progress. AR 1218. The notes also stated that while D is "sometimes defiant," his paraprofessional is continuing to work with him on classroom behavior and following rules. *Id.*

Around the second week in November, D's mother expressed concern to D's special education teacher regarding his grades. AR 1390. The teacher told D's mother that she would talk to D's teachers and follow-up with her. *Id.* On December 2, 2015, D's mother again expressed concern about D's grades to his special education teacher. AR 1392. The teacher reassured D's mother that there was still time for D to get his grades up and that she would discuss the situation with D's paraprofessional. *Id.* On December 10, 2015, D's mother asked the special education teacher to call her to discuss D's grades. AR 1394.

On January 21, 2016, D's mother wrote a note to Cassandra Steele, the school district's special education director, requesting a call to discuss "finding someone who can figure out how to help motivate [D] because poor grades mean nothing to him." AR 1418. She suggested that they "may need to rearrange setting for [D's] educational needs." *Id.* Steele informed D's mother on Monday, January 25, 2016, that she contacted a behavior analyst to consult with her and D's team. AR 1422. She asked D's mother to have D's team at Horace Mann schedule a conference, which she would plan to attend. *Id.* On January 26, 2016, D's mother emailed the team requesting an immediate conference "[i]n light of the past issues and the abrupt decline in [D's] academics and behavior." AR 1424. She notified the team that her attorney planned to attend. *Id.* A meeting was scheduled for Thursday, January 28, 2016, but was cancelled because the parents' attorney had a scheduling conflict. AR 1430. On February 1, 2016, D's parents filed a due process complaint.[1] AR 834. Steele emailed the parents' attorney seeking parental consent for the behavior analyst to begin observing D and working with his team to develop a functional behavior assessment. AR 1432. The attorney told Steele that the parents would not consent and would instead wait for the resolution conference. *Id.* A resolution conference was conducted, but D's parents and their attorney walked out. AR 1091. As a result, the school district never received the parents' consent for the behavior analyst to begin observing D and develop a functional behavioral assessment.

**III.**

The Individuals with Disabilities Education Act requires local agencies to provide students with disabilities a free appropriate public education. *Lathrop R-11 Sch. Dist. v. Gray*, 611 F.3d 419,

---

[1] D's parents dismissed that complaint in March 2016 because the hearing officer refused to grant a continuance and immediately filed the instant complaint.

424 (8th Cir. 2010). The Act does not require schools to ensure that disabled students acquire specific knowledge. *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 198, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). In fact, the Act does not require schools to "guarantee that the student actually make any progress at all." *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 642 (8th Cir. 2003). A school meets its legal obligations under the Act when it "(1) complies with the law's procedures in developing an [individualized education program], and (2) the resulting IEP is 'reasonably calculated to enable the child to receive educational benefits.'" *Lathrop*, 611 F.3d at 424 (citation omitted).

The parents here do not contest the hearing officer's determination that the school district complied with the Act's procedural requirements in developing D's individualized education program. Document #15 at 12. They challenge only whether D's education program was substantively reasonable. *Id.* They say that the program was not reasonable because it needed a behavior intervention plan but did not have one; and they contend that the lack of a behavior intervention plan denied D a free appropriate public education.

An individualized education program passes muster substantively when it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *Id.* Courts reviewing an education program "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* (emphasis in the original).

As noted, D's individualized education program for the 2015-16 school year was adopted in May of 2015. At that time, the team reported that D had made progress during the 2014-15 school year. At the hearing, D's special education teacher testified:

> Q   As far as I know, there is no Behavior Intervention Plan for [D] that was used during this school year [2015-16]. Is that correct?
>
> A   That's not true. There was a Behavior Plan, and we brought it forward and we used the recommendations from a Behavior Plan. We did bring it forward. It may not have been done at Mann, but when I went through his file, I brought it forward.
>
> Q   Okay. Time out, again. Let's look – Doctor Whitby's report is on 4-9-13. That's when it was dated. She talks about the fact that the Little Rock School District – I guess it was 2014. She said the Little Rock School District did not seek an expert or support until January 2014. Do you have a Behavior Support Plan that was developed during [D's] seventh grade year?
>
> A   I believe. I don't know. Let me check to see if it's – seventh grade year. This is '15-'16. His seventh grade year would be '14-'15?
>
> Q   Yes, ma'am.
>
> A   It would be '14-'15. I know in the seventh grade, I brought one forward and I used it. And then, in the eighth grade, I don't think we did, because his behaviors have pretty much just decreased. He had his days. But as far as the behavior when we first encountered him, we didn't have those anymore. And so, just whatever was there, I just brought it forward to use.

AR 522-23. Thus, D's 2015-16 individualized education program represented a continuation of the program that had enabled him to make progress during the 2014-15 school year. Viewed prospectively, it was reasonably calculated to enable him to make progress in light of his circumstances.

D's parents argue that his program should have been amended at the conference held on October 14, 2015, because his grades were unsatisfactory and his behavior had deteriorated. The team reported that D was sometimes defiant and sometimes would not follow instructions but also

9

that he had "shown progress." AR 1218. D's student disciplinary records show no infractions for August or September of 2015. AR 1256. He had infractions on two days in October before the October 14 conference—October 8 and October 10. On one of those dates, and perhaps both (the testimony is unclear), his paraprofessional was absent and replaced by a substitute. *Id.*; AR 0192-96. Again, viewed prospectively, as of October 14, 2015, D's individualized education program was reasonably calculated to enable him to make progress appropriate in light of his circumstances.

Moreover, the Act nowhere requires that individualized education programs include a behavior intervention plan. *Lathrop*, 611 F.3d at 426. The Act states that an individualized education program team shall, in the case of a child whose behavior impedes the child's learning or that of others, "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior[.]" 20 U.S.C. § 1414(d)(3)(B)(i). D's 2015-16 individual education program provided him with a paraprofessional to accompany him throughout the school day, included behavioral management strategies, and addressed D's behavior throughout, which comports with section 1414(d)(3)(B)(i).

Still, the parents maintain that *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022 (8th Cir. 2003), supports their argument that D's individual education program was substantively unreasonable because it lacked a behavior intervention plan. They say that the hearing officer "erred as a matter of law by not following that case." Document #15 at 12. The hearing officer took note of *Neosho* and explained in some detail the factual differences between that case and this one. AR 124-25.

The court in *Neosho* held that the student was denied a free appropriate education because his behavior made it such that he could not obtain a benefit from his education. 315 F.3d at 1029. The court found that "the need for—and the ability to create—a proper behavior modification plan

10

existed before [the School District] made the effort to [create a plan]." *Id.* at 1030 (alterations in original). The court also noted that the student's behavioral problems were "the major concern at every IEP meeting."

As the hearing officer found, the facts here are quite different. D's paraprofessional, his speech therapist, and his teachers testified that D's behavior improved significantly during his time at Horace Mann. The hearing officer credited that testimony and so does the Court. The improvement in D's behavior was due to the strategies, delineated above, that were implemented at Horace Mann. Those strategies were listed in D's individualized education plan. D's mother described the circumstances that precipitated her January 26, 2016 request for an immediate conference as "an abrupt decline in [D's] academics and behavior," which is significantly different from the facts in *Neosho*. Here, the school district responded promptly to the request for a conference. The school district immediately requested parental permission for a behavior analyst to begin observing D, but the parents never gave the needed consent. *Neosho* is inapposite.

## IV.

The parents argue that the hearing officer improperly excluded the testimony of their expert witness, Dr. G. Richmond Mancil. Near the beginning of Dr. Mancil's testimony, the school district objected because he had been furnished with transcripts of prior testimony by the parents' attorney, who had also invoked the witness sequestration rule. The rule provides, in both its state and federal form, that at the request of a party the court must order witnesses excluded so that they cannot hear the testimony of other witnesses but exempts a party who is not an actual person, an officer, or employee of a party who is not an actual person designated as its representative, or a person whose presence is shown by a party to be essential to the presentation of the case. Ark. R. Evid. 615; Fed.

R. Evid. 615. The hearing officer decided to receive Dr. Mancil's testimony and reserve ruling on whether it was admissible until the parties could brief the issue. In its post-hearing brief, the school district argued that the parents had failed to show that Dr. Mancil's presence was essential to the presentation of the case. D's parents did not address the issue in their post-hearing brief.

Although they did not address the issue in their post-hearing brief before the hearing officer, they have addressed it in their briefs before the Court. While, on the one hand, they argue that it was essential to the presentation of their case for Dr. Mancil to review the testimony of the witnesses, they also say that the review of that testimony did not change any of his opinions; it merely changed some of the recommendations that he made. Document #15 at 9-10. Indeed, they argue that the testimony that Dr. Mancil reviewed "simply *confirmed* his opinions contained in his 1 March 2016 report." *Id*. at 10 (emphasis in the original). From this argument it appears that reviewing the transcripts was not essential to the presentation of the parents' case. The parents also note that Dr. Mancil's report was not struck and is included in the stipulated record. They say that Dr. Mancil's report "more clearly explains how and why the District violated the IDEA by not conducting [a functional behavior assessment] and developing and approving an informed [behavior intervention plan]." Document #15 at 10.

In this Court's view, the problem with Dr. Mancil is not that he reviewed the testimony of the fact witnesses from the school district; the problem is that Dr. Mancil's opinions are based on insufficient information. Dr. Mancil opined in his report that the school district had not attempted to address D's behaviors that resulted in his being removed from the classroom, sent home, or failing his classes. AR 972. At the hearing, he testified that he prepared his report without visiting the school, observing D in the classroom, or interviewing anyone who worked with D at the school. AR

12

986. He prepared his report before he saw the notes of D's paraprofessional. AR 905. Since he had not visited the school, observed D in the classroom, interviewed anyone who observed D in the classroom, or reviewed the paraprofessional's notes, he did not have information sufficient for him to form an opinion as to whether the school district had attempted to address D's behaviors; yet, he rendered an opinion on that issue.

Dr. Mancil's testimony at the hearing consisted largely of reviewing the paraprofessional's notes from the 2015-16 school year and commenting on the instances when she recorded that D had misbehaved. Based on that retrospective view, he concluded that D's individualized education plan needed a behavior improvement plan. Dr. Mancil's opinion that D was not making progress was based solely on information from the 2015-16 school year. AR 1021. He did not, apparently, review the paraprofessional's notes from the preceding two years to see whether D's behavior had improved. D's paraprofessional, speech therapist, and teachers testified that D had progressed while at Horace Mann—a period that reached back to February 2014. That progress was due to D's individualized education program, which provided him with a paraprofessional to accompany him throughout the school day and adopted strategies to address D's behavior problems. The upshot of Dr. Mancil's testimony was to contradict the testimony of the witnesses who were with D at school and who testified, in effect, that D's behavior improved at Horace Mann due to his individualized education program. Since Dr. Mancil did not review notes from D's previous school years at Horace Mann, he lacked information sufficient to enable him to assess whether D progressed during the 2015-16 school year as compared to previous years. Without this information, he could not form credible opinions on whether D's individualized education plan was reasonable and whether the school district was providing D with a free appropriate public education.

## CONCLUSION

The preponderance of the evidence does not show that the Little Rock School District violated the Individuals with Disabilities Education Act by failing in its duty to provide D with a free appropriate public education during the 2015-16 school year. The relief requested by Don Cook, individually and as parent and next friend of D, and Elizabeth Jacoby, individually and as parent and next friend of D, is DENIED. The complaint is dismissed with prejudice.

IT IS SO ORDERED this 3rd day of October, 2018.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE